Bonnie **RUBECK**, Plaintiff,

v.

**SHERIFF OF WABASH COUNTY, Larry Rice, Rich White, Mark Henderson, Harold Learned, Edie Gidley, and Sally Bennett, Defendants.**

No. 3:92CV290AS.

United States District Court,
N.D. Indiana,
South Bend Division.

May 27, 1993.

John W. Emry, Franklin, for plaintiff.

Caren L. Pollack, James S. Stephenson, Indianapolis, for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I. Introduction

On May 7, 1992, plaintiff Bonnie A. Rubeck, appearing by counsel, filed a complaint purporting to state a claim under 42 U.S.C. § 1983, and invoking this court's jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3) and (4). A motion for summary judgment was filed by defendants on March 10, 1993. On April 22, 1993, the plaintiff's counsel filed a memorandum in opposition to the motion for summary judgment.

### II. Summary Judgment

█ Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Russo v. Health, Welfare & Pension Fund, Local 705*, 984 F.2d 762 (7th Cir.1993).

A thorough discussion of Rule 56 by the Supreme Court of the United States can be found in a trilogy of cases decided in 1986. *See, Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)[1]; and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

█ The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56). A material question of fact is a question which will be outcome determinative of an issue in the case. *Wainwright Bank v. Railroadmens Federal Sav.*, 806 F.2d 146 (7th Cir.1986). The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

█ Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings, *Hughes v. Joliet Correctional Center*, 931 F.2d 425, 428 (7th Cir.1991), or upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir.1992). "The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion." *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990).

█ During its analysis, this court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Brennan v. Daley*, 929 F.2d 346, 348 (7th Cir.1991). Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson*, 477 U.S. at 252–255, 106 S.Ct. at 2512–2514.

For academic insight into *Celotex* and *Anderson*, see Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court*, 116 F.R.D. 183, 194 (1987), where the author states:

> The recent Supreme Court cases likely require that summary judgment be more readily granted.... This emerging trend signals a new era for summary judgment, one in which the old presumptions are giving way to a policy of balancing and efficiency, and the mechanism is more appropriate to double as a sufficiency motion—allowing some sort of trial itself on the paper record.

More recently Childress has written that *Celotex* and *Anderson* clarify that Rule 56 motions

---

1. For the judicial epilogue of *Celotex*, see *Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33 (D.C.Cir.1987), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

should not be hesitantly granted when appropriate.... Any litigant dealing with summary judgment must be aware of this new trend, the Court's cases, their application in each circuit, and the direction they portend. Pretrial practice is a new ballgame.

Childress, *A Standards of Review Primer: Federal Civil Appeals,* 125 F.R.D. 319, 343 (1989).

Recent object lessons applying these ideas are found in *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 370–371 (7th Cir.1992); *Karazanos v. Navistar Intern. Transp. Corp.,* 948 F.2d 332, 335 (7th Cir. 1991); and *Old Republic Ins. Co. v. Federal Crop Ins. Corp.,* 947 F.2d 269, 273–274 (7th Cir.1991).

### III. Eighth Amendment and Deliberate Indifference

■ In their motion for summary judgment, the defendants explain that the plaintiff was booked into the Wabash County Jail on June 30, 1990. The plaintiff's jail record prepared on June 30th indicates that upon her admission to the jail that she suffered from a skin disease on her arms, legs, and hands. The booking officer noted on the medical screening questionnaire that the plaintiff was currently taking Cortisone cream and Hydroxine tablets. The defendants concede that after the plaintiff had been in the Jail for two or three days, she noted insect bites on her body. According to the defendants, the plaintiff made her first written request on July 2, 1990, in which she complained of an "extreme rash problem." The defendants maintain that although she did not have her medication with her originally, her mother eventually provided the jail officials with it and it was administered regularly beginning on July 3, 1990. On July 6, 1990, defendant Honeycutt indicated in the jail log that he felt that the plaintiff's rash was becoming infected, and required medical attention as soon as possible, and the plaintiff was taken to the Wabash County Hospital on July 7, 1990.

The plaintiff contends that shortly after her incarceration at the Wabash County Jail, she discovered insect bites all over her torso. The plaintiff explains that she had a preexisting condition of psoriasis before she entered the jail. The plaintiff maintains that her mother attempted to deliver hydrogen peroxide and other medications for her to the jail, but the defendants did not allow it. The plaintiff further maintains that she made repeated requests for medical help to the abovementioned defendants. In attempting to elicit medical attention, the plaintiff contends that she called attention to and displayed the insect bites to defendants Bennett and Gidley.

The plaintiff explains that she had approximately 100 bites which turned into open sores during her stay in the jail. She maintains that the sores were "swollen, red, puss ridden, and very painful." *See Plaintiff's Motion for Summary Judgment.* Accompanying the above described condition was nausea, fever, a loss of appetite, and sleeplessness. The plaintiff maintains that she made a number of written requests to jail officials. Finally, on July 7, 1990, the plaintiff began to vomit blood and was taken to Wabash County Hospital. Apparently, at the hospital, the plaintiff was only treated for her nausea and not the insect bites. Therefore, when she returned to the jail, she resumed her efforts to have her condition checked. In so doing, she requested to see the jail physician. According to the plaintiff, she also wrote a note directly to Henderson requesting to see the jail physician.

The basic standard of deliberate indifference is found in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). *See also Pacelli v. DeVito,* 972 F.2d 871 (7th Cir.1992), *Swofford v. Mandrell,* 969 F.2d 547 (7th Cir.1992), *Duane v. Lane,* 959 F.2d 673 (7th Cir.1992), *Jackson v. Duckworth,* 955 F.2d 21 (7th Cir.1992), *McGill v. Duckworth,* 944 F.2d 344 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992), *Wallace v. Robinson,* 940 F.2d 243 (7th Cir.1991), *Salazar v. Chicago,* 940 F.2d 233 (7th Cir.1991), *Holmes v. Sheahan,* 930 F.2d 1196 (7th Cir.1991), *Goka v. Bobbitt,* 862 F.2d 646, 650 (7th Cir.1988), *Richardson v. Penfold,* 839 F.2d 392, 394–95 (7th Cir.1988), and *Felders v. Miller,* 776 F.Supp. 424 (N.D.Ind.1991). *See also Musgrove v. Broglin,* 651 F.Supp. 769 (N.D.Ind.1986), and

*Burris v. Kirkpatrick,* 649 F.Supp. 740 (N.D.Ind.1986).

The Seventh Circuit recently observed that "[i]n order to show 'deliberate indifference,' a plaintiff is required to prove that the prison official's action was deliberate or reckless in the *criminal sense." Santiago v. Lane,* 894 F.2d 218 (7th Cir.1990) (emphasis added) (footnote omitted). The United States Supreme Court has cited the Seventh Circuit's criminal recklessness standard with approval. *Whitley v. Albers,* 475 U.S. 312, 321, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986), *citing Duckworth v. Franzen,* 780 F.2d 645, 653 (7th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). In *Franzen,* the Seventh Circuit noted that punishment under the Eighth Amendment "implies at a minimum actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." 780 F.2d at 653. *See also Wilks v. Young,* 897 F.2d 896 (7th Cir.1990). *Compare* the insightful analysis of Judge Anderson in *Gomm v. DeLand,* 729 F.Supp. 767 (D.Utah 1990).

On June 17, 1991, in *Wilson v. Seiter,* —— U.S. ——, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), the Supreme Court of the United States, speaking through Justice Scalia, has revisited this issue under the Eighth Amendment. An extensive quotation therefrom is in order:

> These cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment. *See also Graham v. Connor,* 490 U.S. 386, 398 [109 S.Ct. 1865, 1873, 104 L.Ed.2d 443] (1989). Petitioner concedes that this is so with respect to some claims of cruel and unusual prison conditions. He acknowledges, for instance, that if a prison boiler malfunctions accidentally during a cold winter, an inmate would have no basis for an Eighth Amendment claim, even if he suffers objectively significant harm. Reply Brief for Petitioner 12–14. Petitioner and the United States as *amicus curiae* in support of petitioner, suggests that we should draw a distinction between "short-term" or "one-time" conditions (in which a state of mind requirement would apply) and "continuing" or "systemic" conditions (where official state of mind would be irrelevant). We perceive neither a logical nor a practical basis for that distinction. The source of the intent requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual punishment. If the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify. As Judge Posner has observed:

> > "The infliction of punishment is a deliberate act intended to chastise or deter. This is what the word means today; it is what it meant in the eighteenth century.... [I]f [a] guard accidentally stepped on [a] prisoner's toe and broke it, this would not be punishment in anything remotely like the accepted meaning of the word, whether we consult the usage of 1791, or 1868, or 1985."

> *Duckworth v. Franzen,* 780 F.2d 645, 652 (7th Cir.1985), *cert. denied,* 479 U.S. 816 [107 S.Ct. 71, 93 L.Ed.2d 28] (1986). *See also Johnson v. Glick,* 481 F.2d 1028, 1032 (2nd Cir.1973) (Friendly, J.), ("The thread common to all [Eighth Amendment prison cases] is that 'punishment' has been deliberately administered for a penal or disciplinary purpose"), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033 [94 S.Ct. 462, 38 L.Ed.2d 324] (1973). Cf. *Block v. Rutherford,* 468 U.S. 576, 584 [104 S.Ct. 3227, 3231, 82 L.Ed.2d 438] (1984); *Bell v. Wolfish,* 441 U.S. 520, 537–539 [99 S.Ct. 1861, 1873–1874, 60 L.Ed.2d 447] (1979). The long duration of a cruel prison condition may make it easier to establish knowledge and hence some form of intent, cf. *Canton v. Harris,* 489 U.S. 378, 390, n. 10 [109 S.Ct. 1197, 1205, n. 10, 103 L.Ed.2d 412] (1989); but there is no logical reason why it should cause the requirement of intent to evaporate. The proposed short-term/long-term distinction also defies rational implementation. Apart from the difficulty of determining the day or hour that divides the two categories [is it the same for all conditions?] the violations alleged in

specific cases often consist of composite conditions that do not lend themselves to such pigeonholing. Cf. *McCarthy v. Bronson*, 500 U.S. ——, —— [111 S.Ct. 1737, ——, 114 L.Ed.2d 194] (1991) (slip op., at 6).

\* \* \* \* \* \*

As other courts besides the Court of Appeals here have understood, see *Wellman v. Faulkner*, 715 F.2d 269, 275 (7th Cir.1983), *cert. denied*, 468 U.S. 1217 [104 S.Ct. 3587, 82 L.Ed.2d 885] (1984); *Hoptowit v. Ray*, 682 F.2d 1237, 1247 (9th Cir.1982); *Wright v. Rushen*, 642 F.2d 1129, 1133 (9th Cir.1982), our statement in *Rhodes* [*v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)] was not meant to establish the broad proposition that petitioner asserts. Some conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets. *Compare Spain v. Procunier*, 600 F.2d 189, 199 (7th Cir.1979) (outdoor exercise required when prisoners otherwise confined in small cells almost 24 hours per day) with *Clay v. Miller*, 626 F.2d 345, 347 (4th Cir.1980) (outdoor exercise not required when prisoners otherwise had access to day room 18 hours per day). To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as "overall conditions" can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists....

*Wilson v. Seiter*, at —— ——, ——, 111 S.Ct. at 2324-25, 2327.

The basic constitutional guide for cases involving pretrial detainees is *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *See also Martin v. Tyson*, 845 F.2d 1451 (7th Cir.), *cert. denied*, 488 U.S. 863, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988). For significant earlier teaching on this subject, see *Lock v. Jenkins*, 641 F.2d 488 (7th Cir.1981). Certainly, the point is still well taken that Judge Fairchild made in *Lock* that the rationalization here is under the due process clause, and not under the Eighth Amendment *per se*. However, under current doctrine, the standards are identical.

In *Barrow v. Wahl*, No. 85 C 8166, 1986 WL 15109, Slip Opinion LEXIS (N.D.Ill. 1986), Judge Marshall evaluated an issue of this ilk. In evaluating whether to grant a motion to dismiss, Judge Marshall explained:

Plaintiff developed two separate skin rashes during his incarceration. The rashes were painful and irritating. Plaintiff made at least six requests to see a doctor before he was allowed to do so. The doctor, defendant Gonzalo, examined plaintiff for less than a minute. Gonzalo then prescribed Keri-lotion for at least one of the rashes. (The complaint does not state whether Dr. Gonzalo prescribed any treatment for the second rash.)

The Keri-lotion proved ineffective. Plaintiff continued to suffer from the rash for which Gonzalo had prescribed the lotion. He obtained relief after his mother contacted the jail administration and suggested a different medication, the name of which she had received from her family doctor. The other rash also continued; it "became so bad (painful and irritating), [plaintiff] was taken to the emergency room at the local hospital."

Plaintiff claims that Gonzalo improperly diagnosed and treated him. He contends that this defendant's actions demonstrated deliberate indifference to his medical needs and constituted punishment which violated the Constitution's eighth amendment.

Gonzalo argues that the allegations in the amended complaint do not demonstrate a constitutional violation. He relies upon *Estelle v. Gamble*, 429 U.S. 97 [97 S.Ct. 285, 50 L.Ed.2d 251] (1976), in which the Supreme Court stated that "an inadvertent failure to provide adequate medical care cannot be said to constitute" a Constitutional violation. *Id.* at 105 [97 S.Ct. at 292]. "In order to state a cognizable claim," the Court continued, "a prisoner

must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106 [97 S.Ct. at 292]. Gonzalo contends that the allegations of the complaint demonstrate neither his deliberate indifference nor plaintiff's serious medical needs. The complaint indicates, Gonzalo continues, that he examined plaintiff, made a diagnosis, and prescribed treatment for a nonserious condition. That the treatment was ineffective demonstrates, at most, Gonzalo's negligence, which is not actionable.

The claims against Gonzalo should be dismissed only if it is "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 [78 S.Ct. 99, 102, 2 L.Ed.2d 80] (1957). Because the plaintiff drafted his complaint without the assistance of counsel, is should be held "to less stringent standards than formal pleading drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520 [92 S.Ct. 594, 596, 30 L.Ed.2d 652] (1972).

In light of these standards of review, we conclude that plaintiff is entitled to prove his case. While Gonzalo is correct when he argues that he cannot be held liable for negligently failing to provide effective treatment, plaintiff alleges more than mere negligence. Plaintiff claims that Gonzalo's cursory examination exhibited a deliberate indifference to his needs. It is for the trier of fact to decide whether a doctor who allegedly took less than a minute to examine two skin rashes was deliberately indifferent to his patient's needs. Moreover, it is not beyond doubt that plaintiff's skin condition, which allegedly landed him in a hospital emergency room, was not a serious medical condition. For those reasons, defendant Gonzalo's motion to dismiss for failure to state a claim is denied.
*Id.*

Initially, this court is certainly cognizant of the differing standards between a motion to dismiss and a motion for summary judgment; however, the abovementioned opinion by Judge Marshall contains facts that are very similar. Here, as in *Barrow,* the plaintiff constructs an Eighth Amendment violation on the basis of a skin problem that developed while in custody. In contrast, the main defendant in *Barrow* is a doctor whereas here, the main defendants are actual jail officials, and certainly there is a difference in the required response from each entity.

In *Diaz v. Broglin,* 781 F.Supp. 566 (N.D.Ind.1991), this court after a careful and full examination, adopted the Report and Recommendation of Magistrate Judge Robin D. Pierce, which dealt with a similar claim and brought under 42 U.S.C. § 1983. In *Diaz,* as this court indicated, Magistrate Judge Pierce "has ably defined the current status of the law in this regard" *Id.* at 567–58. The opinion is even more apt insofar as the plaintiff asserted a claim based on "the defendants' alleged denial of medication to him to treat a skin problem." *Id.* at 569.

In evaluating the Eighth Amendment claim in the context of deliberate indifference, Magistrate Judge Pierce explained:

A prisoner can prove criminal recklessness only by demonstrating a defendant's subjective mental state; liability cannot be predicated on an objective consideration of what a defendant "should have known." *McGill v. Duckworth,* 944 F.2d 344 (7th Cir.1991); see *Steading v. Thompson,* 941 F.2d 498, 499–500 (7th Cir.1991). The requisite subjective intent may be established by: 1) showing that a defendant had " 'actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it,' " *McGill,* 944 F.2d at 348, quoting *Franzen,* 780 F.2d at 653; or 2) showing that a defendant deliberately avoided acquiring knowledge of the impending harm. *McGill,* 944 F.2d at 350–51.
*Id.*

It is clear to this court that when the plaintiff became an inmate in the Wabash County Jail on June 30, 1993, there was evidence of skin disease on her arms, legs and hands. Apparently, while in the Jail, she was inflicted with insect bites. Again, according to the plaintiff, she exhibited the infected insect bites to defendants Bennett and Gidley. She was taken to the Wabash

Hospital for medical attention on July 7, 1990, which was within a day period of her second written request for attention. According to the plaintiff, she also wrote a note directly to Henderson requesting to see the jail physician about the insect bites.

It is difficult to decipher whether a defendant has exhibited deliberate indifference on a paper record at the summary judgment level. When all of the sworn testimony is examined together, this court finds that there are genuine issues of fact as to deliberate indifference. While this situation in the Wabash County Jail would appear to be similar to that of the Marshall County Jail which was involved in the case of *Martin v. Tyson, supra,* this court notes some differences. The defendants presented a very compelling argument on this issue, and this court notes that the plaintiff's case survived this summary judgment motion by a slender reed. There are many facts that inure to the benefit of the defendants, however, this court is troubled by the description of the insect bites. On this issue, the plaintiff maintains that she displayed the bites to defendants Bennett and Gidley, and this court finds that their response presents issues that can not be resolved at this level. This is also applicable to Henderson. Here, this court finds that there are too many genuine issues of fact surrounding this issue as it relates to the requisite subjective intent. Here, this court finds that it is for the trier of fact to decide whether the defendants had " 'actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it,' " *McGill,* 944 F.2d at 348, quoting *Franzen,* 780 F.2d at 653; or 2) showing that a defendant deliberately avoided acquiring knowledge of the impending harm. *McGill,* 944 F.2d at 350–51. Therefore, in light of the foregoing, this court finds that summary judgment will not be granted for defendants Henderson, Gidley, and Bennett.

## IV. Qualified Immunity

The defendants invite this court to bottom a decision here on qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *See*

*also Rakovich v. Wade,* 850 F.2d 1180 (7th Cir.), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). Very recently, in *Hill v. Shelander,* 992 F.2d 714 (7th Cir. 1993), the Seventh Circuit evaluated the qualified immunity issue in the context of the Eighth Amendment. In this cogent opinion, the court, speaking through Judge Rovner, explained:

> *Harlow* has created a "conundrum," however, in cases where the alleged constitutional violation requires a showing of intent. See *Hansen [v. Bennett ]*, 948 F.2d [397] at 399 n. 4 [7th Cir.1991]; *Elliott [v. Thomas ]*, 937 F.2d [338] at 344 [7th Cir. 1991]. Although *Harlow* eschews an inquiry into subjective intent, in some cases, proof of the defendant's mental state is an element of the constitutional violation. See *Hansen,* 948 F.2d at 399 n. 4; *Elliott,* 937 F.2d at 344; *Rakovich,* 850 F.2d at 1210. We have previously held that by eliminating the subjective component from the qualified immunity analysis, the Supreme court did not intend to "limit civil rights actions to those where state of mind was not a part of the substantive law." *Rakovich,* 850 F.2d at 1210 (emphasis in original); see also *Hansen,* 948 F.2d at 399 n. 4; *Elliott,* 937 F.2d at 344. Rather, we have attempted to resolve the conundrum by developing a two-part qualified immunity inquiry: " '(1) does the alleged conduct set out a constitutional violation? and (2) were the constitutional standards clearly established at the time in question?' " *Rakovich,* 850 F.2d at 1210 (quoting *Wade v. Hegner,* 804 F.2d 67[,] 70 (7th Cir.1986)). The defendant's subjective intent may be relevant to the first question, but no to the second. *Id.*

Thus, despite *Harlow's* focus on a purely objective inquiry, the plaintiff must be afforded an adequate opportunity to establish intent when it is an element of the alleged constitutional violation. See *Elliott,* 937 F.2d at 344. At the same time, to be consistent with *Harlow's* preference that qualified immunity be resolved on summary judgment, we have held that "an assertion of improper motivation must in

addition be accompanied by some specific factual support."

*Id.*

This court holds that just as in the above-mentioned analysis of deliberate indifference there are too many unresolved issues to decide the qualified immunity issue. Again, this court "cannot choose between these differing accounts of the incident on a paper record." *Id.* Here, "[i]f a finder of fact were to accept [the plaintiff's] version, it could infer that [the defendants] acted with malicious intent, meaning that [the plaintiff] could establish an Eighth Amendment violation," *Id.* Of course, the converse is also true and that factual scenario would absolve the defendants of any constitutional violation, and the defendants "would be entitled to qualified immunity." *Id.* Therefore, this court cannot resolve the immunity issue in light of the unresolved issues of fact.

### V. Individual Participation

 Insofar as this case is filed under 42 U.S.C. § 1983, there is a very serious question under *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and its progeny in this circuit, including *Rascon v. Hardiman,* 803 F.2d 269 (7th Cir.1986), and *Adams v. Pate,* 445 F.2d 105 (7th Cir.1971), as to whether there was personal involvement by certain defendants here. In order to determine whether a defendant is liable under § 1983, this court must ascertain whether a certain defendant has caused or participated in the constitutional deprivation. Specifically, a "causal connection, or an affirmative link" must be alleged between the unconstitutional conduct and a defendant. *Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983). In *Rascon v. Hardiman, supra,* the Seventh Circuit, speaking through Judge Ripple, indicated that:

> To recover for damages under 42 U.S.C. § 1983, a plaintiff must establish defendant's personal responsibility for the claimed deprivation of a constitutional right. *Duncan v. Duckworth,* 644 F.2d 653, 655 (7th Cir.1981). However, a defendant's direct participation in the deprivation is not required. An official satisfies the personal responsibility requirement of

section 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.

*Id.* at 274. (quoting *Smith v. Rowe,* 761 F.2d 360 (7th Cir.1985). Here, at the summary judgment level, this court finds no facts indicating such personal involvement, except for the defendants mentioned in the section on deliberate indifference, namely defendants Henderson, Gidley, and Bennett. Specifically, in light of the foregoing, the plaintiff has tendered no evidence of any personal knowledge or involvement by the following defendants: Larry Rice, the Sheriff in his individual capacity, White, and Learned.

### VI. Municipal Liability for Policies, Regulations, and Procedures

 The plaintiff has also asserted his claim against the Sheriff in his official capacity. "With respect to the official capacity claim, ..., in order to succeed, [the plaintiff] has to prove that an official policy or custom of the Sheriff's Department was responsible for [the plaintiff's] mistreatment." *Holmes v. Sheahan,* 930 F.2d 1196 (7th Cir.1991). In so doing, a series of Supreme Court cases are referred to, namely, *Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), and *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). It may well be that *City of Oklahoma City* would be beneficial to the defendants here. It does not appear that *Kentucky, Pembaur,* and *Canton* are beneficial to the plaintiff here.

In *Holmes v. Sheahan, supra,* the Seventh Circuit, speaking through Judge Flaum, evaluated an Eighth Amendment claim wherein the plaintiff claimed he "was denied medical care for a painful skin condition by Cook County authorities." *Id.* at 1197. Specifically, the plaintiff claims that he was not given access to a physician and failed to receive medical attention for sebaceous cysts on his

scalp. In pursuing this claim, the plaintiff sued the defendants in their official capacity claiming that the "Cook County Jail ... deprived him of his constitutional rights not merely by failing to treat him, but 'by failing to institute systems or procedures to ensure [medical attention].'" *Id.* at 1200. Additionally, the plaintiff "also alleges that the County failed to properly train Jail employees to attend to the medical needs of inmates." *Id.* In examining this claim, the court explained:

Holmes' claims then, sound in inaction—that is, the County's failure to institute the policies and procedures necessary to ensure that prison inmates receive appropriate medical care. We have previously held that deliberate indifference to inmates' medical needs may indeed be demonstrated by proving "that there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Benson* [*v. Cady* ], 761 F.2d [335] at 341 [7th Cir. 1985] (quoting *Wellman,* 715 F.2d at 272). The County's failure to train its employees is similarly actionable under a deliberate indifference standard. In making failure-to-train claims, plaintiffs must establish

that a municipality's training program is inadequate, and that "such inadequate training can justifiably be said to represent 'city policy'". *Canton v. Harris,* 489 U.S. 378, [381] 109 S.Ct. 1197, 1201, 103 L.Ed.2d 412 (1988). The latter holds true when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* *Id.* Here, the plaintiff has not presented any evidence to make out a viable failure to train claim.[2]

Very recently, in *Cornfield v. Consolidated High School District No. 230,* 991 F.2d 1316 (7th Cir.1993), the Seventh Circuit, speaking again through Judge Flaum, discussed several of the abovementioned cases. An extensive quotation therefrom is in order:

Under *Monell v. Dept. of Social Services of City of New York,* municipalities ... may not be held liable under section 1983 simply because they employed the tortfeasor acting within the scope of his or her employment. Rather, municipal liability attaches only "when execution of a government's policy or custom, whether made by

**2.** In pursuing § 1983 actions, often plaintiffs base their claim on a failure to train theory. In *Cornfield,* the court also discussed this dimension of municipal liability:

An allegation of a "failure to train" is available only in limited circumstances. To prevail, [the plaintiff] must show the [defendants'] "failure to train its employees in a relevant respect evidences a 'deliberate indifference'" to the rights of [the plaintiff]. *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). Deliberate indifference itself is an elusive standard. The Supreme Court reasoned that policymakers would be deliberately indifferent when "in light of the duties assigned to the specific ... employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights." *Id.* In order to ensure that isolated instances of misconduct are not attributable to a generally adequate policy or training program, we require a high degree of culpability on the part of the policymaker. Coupled with a causation requirement, this standard ensures that the violation alleged is not too far removed from the policy or training challenged as inadequate. Taken together, these two considerations amount to a requirement that lia-

bility be based on a finding that the policymakers have actual or constructive notice that a particular omission that is likely to result in constitutional violations. Otherwise, we would risk creating de facto respondeat superior liability, which is contrary to *Monell.* See *Monell,* 436 U.S. at 693–94, 98 S.Ct. at 2037–38.

Accordingly, it may be that a municipality could fail to train its employees with respect to a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face. See *City of Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. at 1205 n. 10. Given the nebulous standards governing student searches, school districts and school district administrators cannot be held accountable on this ground because the particular constitutional duty at issue is not clear. Alternatively, municipal liability would be proper for a failure to train when the need is not necessarily obvious from the outset, but the pattern or frequency of constitutional violations would put the municipality on notice that its employees' responses to a recurring situation are insufficient to protect the constitutional rights involved. *Id.* In other words, the policymakers had acquiesced in a pattern of constitutional violations.
*Id.*

its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under section 1983." 436 U.S. 658, at 694, 98 S.Ct. 2018, [at] 2037–38, 56 L.Ed.2d 611 (1978). Furthermore, plaintiffs cannot claim municipal liability unless they can demonstrate that the enforcement of its policy was the "moving force" behind the constitutional violation. See *City of Oklahoma City v. Tuttle*, 471 U.S. 808[,] 823, 105 S.Ct. 2427[,] 2436, 85 L.Ed.2d 791 (1985) (plurality opinion) ("At the very least, there must be an affirmative link between the policy and the particular constitutional violation alleged.") In order to establish the existence of a policy, a plaintiff may look to: the official pronouncements of municipal or legislative bodies, agency action in accordance with delegated authority, actions by individuals with final decisionmaking authority, inaction or custom.

To carry the day on the former claim, [the plaintiff] would need to establish [that the defendants] had final decisionmaking authority. Only those officials who possess the requisite policymaking authority are capable of establishing "official policy" within the meaning of *Monell*. *Pembaur v. Cincinnati* recognized that under the appropriate circumstances, "municipal liability may be imposed for a single decision by municipal policymakers." 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) (plurality opinion). Moreover, hierarchy is not necessarily dispositive of the issue inasmuch as municipal liability may be predicated upon the act of even a low-level subordinate who has been delegated final authority in a limited area, while a high-level official's order may not be actionable unless he or she possess final decisionmaking authority with respect to that particular are. *Id.* at 483, 106 S.Ct. at 1300.

Of course, identifying those vested with the authority to make policy is no mean feat. The exercise of discretion by a particular official, standing alone, does not give rise to municipal liability. Municipal liability should attach only if the unconsti-

tutional decision was "a deliberate choice to follow a course of action" and if state or local law authorized the decisionmaker "responsible for establishing final government policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483–84, 106 S.Ct. at 1300. More recently, the Supreme Court has confirmed that "final policymaking authority" is a question of state law. *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) (citing *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300). State and local law, as well as "'custom and usage' having the force of law," *St. Louis v. Praprotnik*, 485 U.S. 112, 124 n. 1, 108 S.Ct. 915, 924 n. 1, 99 L.Ed.2d 107 (1988), may illustrate which officials or governmental entities are endowed with final policymaking authority with regard to the action that allegedly caused the particular constitutional or statutory violation. *Jett*, 491 U.S. at 737, 109 S.Ct. at 2723. However, to say that a court must look to state law to determine who has final policymaking authority does little to reveal how a court evaluates the actions of a municipal employee or agent. Certainly someone with executive authority whose actions fly in the face of state of local law is not a policymaker under *Monell* and its progeny. See *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir.1992). However, exercise of executive authority—as opposed to legislative authority—is not necessarily inconsistent with policymaking. See e.g., *Pembaur*, 475 U.S. at 481–84, 106 S.Ct. at 1299–1300.

Of course, the absence of a written policy does not wholly exempt a municipality from liability. Such an approach would create a perverse incentive ... to adopt a policy of not having defined or written policies, the effect of which would be to immunize the municipalities from liability for unconstitutional actions by their agents. The risk is that a municipality will bury its head in the sand rather than acknowledge and attempt to remedy unconstitutional conduct by its employees. Accordingly, in situations that call for procedures, rules, or regulations, the failure to

make a policy itself may be actionable. *Avery v. County of Burke*, 660 F.2d 111, 114 (4th Cir.1981); *Murray v. City of Chicago*, 634 F.2d 365, 366–67 (7th Cir.1980). In other words, a practice of unconstitutional conduct, although lacking formal approval, may provide a basis for municipal liability. In this regard, a single isolated incident of wrongdoing by a non-policy-maker is generally insufficient to establish municipal acquiescence in unconstitutional conduct. See *Tuttle*, 471 U.S. at 823–24, 105 S.Ct. at 2436; *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir.1986); cf. *Strauss v. City of Chicago*, 760 F.2d 765, 769 [7th Cir.1985] (omission may be "sufficiently egregious that plaintiff's injury alone suggest[s] an established policy").

*Id.* Again, here, the plaintiff has failed to present any evidence the make out any of the abovementioned claims.

### VII. Remaining Issues

▇ It also needs to be mentioned that the federal question jurisdiction of this court cannot be invoked simply to require state officials to comport their conduct to state law. See *Pennhurst v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The court realizes fully that state law and regulations can be the basis for a liberty interest. *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

### VIII. Conclusion

In light of the foregoing, this court grants summary judgment for all of the defendants except for Henderson, Gidley, and Bennett on the Eighth Amendment deliberate indifference issue. This court grants summary judgment for the remainder of the defendants for the reasons stated in sections five and six of this opinion.

IT IS SO ORDERED.